IN THE UNITED STATES DISTRCIT COURT
FOR THE NORTHERN DISRICT OF NEW YORK

_____

WALTER J. ROACHE,

                  Plaintiff,          Civil Action No.
                                           9:13-CV-0253 (BKS/DEP)

     v.

MICHAEL HOGAN, *et al.*,

                  Defendants.

_____

APPEARANCES:                            OF COUNSEL:

FOR PLAINTIFF:

WALTER J. ROACHE, *Pro Se*
17129-404
Central New York Psychiatric Center
P.O. Box 300
Marcy, NY 13403

FOR DEFENDANT:

HON. ERIC T. SCHNEIDERMAN         ADRIENNE J. KERWIN, ESQ.
New York State Attorney General     Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Walter Roache, a resident of the Central New York Psychiatric Center ("CNYPC"), a facility operated by the New York State Office of Mental Health ("OMH"), has commenced this action against Shelby Ferguson, Jeffrey Nowicki, Michael Hogan, and Donald Sawyer, current and former OMH employees, pursuant to 42 U.S.C. § 1983, alleging that, as a result of being denied access to his legal papers since being placed into the CNYPC, he lost the opportunity to pursue appeals in connection with two legal actions filed by him in state and federal court.

Currently pending before the court is a motion for summary judgment brought by defendants seeking dismissal of plaintiff's claims on various grounds. For the reasons set forth below, I recommend that defendants' motion be granted in part, and otherwise denied.

I.    <u>BACKGROUND</u>[1]

Plaintiff has been civilly confined in the CNYPC, a secure treatment facility operated by the OMH pursuant to New York Mental Hygiene Law § 10.03(o), since on or about April 29, 2010, having been transferred there after being incarcerated at the Fishkill Correctional Facility. Dkt. No. 5 at 2;

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[Dkt. No. 40-1 at 13](#). Upon plaintiff's arrival at the CNYPC, two unidentified individuals employed at the facility began searching his property, including his four laundry bags filled with papers relating to plaintiff's legal actions, for contraband. [Dkt. No. 5 at 2](#); [Dkt. No. 40-1 at 12-13](#). According to plaintiff, the two unidentified individuals halted the search before finishing and told him the search would be completed at a later date. [Dkt. No. 5 at 2](#); [Dkt. No. 40-1 at 13](#). Approximately one month later, after the search had not been resumed and he had not received any of the legal papers contained in the two bags that had yet to be searched, plaintiff inquired into the matter, and was instructed to "write long-term storage and personal property and tell them what happened." [Dkt. No. 40-1 at 13-14](#), 16; *see also* [Dkt. No. 5 at 2](#).

At the times relevant to plaintiff's claims, defendant Ferguson was employed as a Secure Care Treatment Aide I ("SCTA I") and the Property Manager of long-term storage at the CNYPC.[2] [Dkt. No. 40-2 at 1](#), 3. Plaintiff claims that he wrote to defendant Ferguson to "explain[] what happened and how [he] had never [been provided the opportunity] to review the other half [of his legal papers]." [Dkt. No. 40-1 at 14](#); *see also* [Dkt. No. 5 at 2](#). Plaintiff informed defendant Ferguson that, at the time, he

---

[2]      In July 2011, defendant Ferguson was promoted to Secure Care Treatment Aide II ("SCTA II"). [Dkt. No. 40-2 at 5](#).

had two cases pending that needed his immediate attention, one filed in federal court regarding his good time credits, and a second pending in state court concerning parole. *Id.* While defendant Ferguson did not respond to plaintiff's requests in writing, he spoke to plaintiff regarding the issue at least two times when he was on plaintiff's gallery. Dkt. No. 5 at 3; Dkt. No. 40-1 at 22. On one occasion, defendant Ferguson explained to plaintiff that he needed to "get rid of [some] papers." Dkt. No. 5 at 3. On the second occasion, after plaintiff had written several letters, defendant Ferguson threatened to never answer plaintiff's requests if he continued to write letters. Dkt. No. 40-1 at 22.

According to plaintiff, because defendant Ferguson ignored his requests, he began to write to (1) defendant Nowicki, the Chief of the Mental Health Treatment Services for the Sex Offender Treatment Program at the CNYPC; (2) defendant Sawyer, the Executive Director of the CNYPC at the relevant times; and (3) defendant Hogan, the former Commissioner of the OMH, for assistance in gaining access to his legal papers located in long-term storage. [3] Dkt. No. 40-1 at 17-18, 19; *see also* Dkt. No. 40-3 at 1; Dkt. No. 40-4 at 1; Dkt. No. 40-5 at 1. Although defendant Nowicki responded to plaintiff's letter, the substance of the

---

[3]     Defendant Sawyer left his position at the CNYPC in June 2011. Dkt. No. 40-5 at 1. Defendant Hogan left the OMH in October 2012. Dkt. No. 40-3 at 1.

response is not clear. *See* [Dkt. No. 40-1](#) (plaintiff testifying vaguely at his deposition that "[defendant Nowicki] said he notified him and he would contact him to do so" without further explanation).[4] Defendant Sawyer wrote plaintiff a letter indicating that he "'concur[red]'" with defendant Nowicki's decisions regarding the matter. *Id.* at 41-42. Plaintiff does not recall if defendant Hogan ever responded to him. *Id.* at 44.

After his efforts to obtain access to his property from OMH officials failed, plaintiff commenced an Article 78 proceeding in Oneida County Supreme Court.[5] [Dkt. No. 5 at 3](#); [Dkt. No. 40-1 at 24](#). According to plaintiff, the proceeding was dismissed because he failed to exhaust the available administrative remedies. *Id.* Following the dismissal, plaintiff filed a request for "a reargument," which resulted in Supreme Court Justice Bernadette T. Clark ordering an in-person hearing concerning the matter

---

[4]     Attached to defendant Nowicki's declaration submitted in support of defendants' motion for summary judgment are memoranda addressed to plaintiff from defendant Nowicki in response to various letters from plaintiff. [Dkt. No. 40-4 at 18](#), 20, 26, 33, 36, 39, 41, 52, 55. The earliest memorandum, however, is dated November 10, 2010, and responds to a complaint from plaintiff regarding a search of his room by OMH officials. *Id.* at 18. None of the memoranda respond to complaints from plaintiff regarding access to his property in long-term storage. [Dkt. No. 40-4 at 18](#), 20, 26, 33, 36, 39, 41, 52, 55.

[5]     Although the record reflects some indication that plaintiff was granted access to at least some of his belongings in long-term storage with help from his attorney, Stephen Clark, Esq. in April and June 2011, it is not clear whether that occurred prior to the filing of plaintiff's Article 78 petition. [Dkt. No. 40-1 at 123](#), 135-36.

on August 10, 2011. [6] *Id.* Defendant Nowicki, plaintiff, Attorney Clark, and Jim Williams, a New York State Assistant Attorney General, appeared at the hearing. Dkt. No. 5 at 3; Dkt. No. 40-1 at 27. According to plaintiff, Justice Clark ordered the CNYPC to provide plaintiff an opportunity to review and organize his property in long-term storage.[7] Dkt. No. 40-1 at 25, 146; *see also* Dkt. No. 5 at 3.

On or about September 6, 2011, plaintiff was summoned to the fifth floor of the CNYPC pursuant to Justice Clark's order, in order to afford him an opportunity to organize his property that was being held in long-term storage. Dkt. No. 40-1 at 28. Aside from plaintiff and Attorney Clark, defendants Ferguson and Nowicki, as well as another individual employed by the OMH, were present. *Id.* at 32; Dkt. No. 40-4 at 4-5. According to plaintiff, at some point while he was organizing his papers, defendant Ferguson told him that he would not be permitted to take any of his property with him back to his room despite Justice Clark's order. Dkt. No. 40-1 at 33; *see also* Dkt. No. 5 at 3-4. Defendants Ferguson and Nowicki,

---

[6]  Plaintiff's amended complaint in this action states that the hearing occurred on September 10, 2011. Dkt. No. 5 at 3. This appears to be a mistake because, at his deposition in connection with this matter, plaintiff was asked to read the date appearing on the transcript of the hearing, and he answered, "Oh, yeah. August 10, 2011." Dkt. No. 40-1 at 26.

[7]  It does not appear that Justice Clark's directive was memorialized in any written decision or order.

however, contend that, after a minute of looking at his belongings, plaintiff "became hostile. . .[,] expressed no interest in sorting his documents or property, [and] turned and walked out of the room." Dkt. No. 40-2 at 4; Dkt. No. 40-4 at 5. Plaintiff alleges that, after defendant Ferguson refused to permit plaintiff to store any of his property in his room, Attorney Clark agreed to file a motion in Oneida County Supreme Court asking Justice Clark to intervene. Dkt. No. 40-1 at 36. According to plaintiff, Justice Clark thereafter rendered another decision again finding that plaintiff had failed to exhaust available administrative remedies. *Id.* at 37-38.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on March 7, 2013, by the filing of a complaint together with an application to proceed *in forma pauperis* ("IFP"), accompanied by a request for the appointment of *pro bono* counsel. Dkt. Nos. 1-3. Although plaintiff's IFP application was granted, Senior District Judge Lawrence E. Kahn denied plaintiff's motion for counsel and dismissed plaintiff's complaint without prejudice to his right to file an amended complaint. Dkt. No. 4. On June 18, 2013, plaintiff submitted an amended complaint, which was accepted for filing by Judge Kahn on November 13, 2013. Dkt. Nos. 5, 7. Plaintiff's amended complaint asserts that his rights under the First, Fifth, Sixth, and Fourteenth

Amendments have been violated by defendants' refusal to allow him access to his property, including his legal papers, held in long-term storage at the CNYPC. *See generally* Dkt. No. 5. As relief, plaintiff seeks monetary damages in the total amount of nine million dollars. *Id.* at 15.

Following the close of discovery, defendants filed the currently pending motion for summary judgment requesting dismissal of all plaintiff's claims based on (1) the lack of personal involvement of defendants Sawyer and Hogan, (2) the lack of evidence demonstrating a genuine dispute of material fact with respect to whether plaintiff's rights have been violated, and (3) qualified immunity. *See generally* Dkt. No. 40-7. Defendants' motion, to which plaintiff has responded in opposition, Dkt. No. 44, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    <u>Personal Involvement</u>

Defendants seek dismissal of all claims asserted against defendants Sawyer and Hogan, arguing that neither of them was personally involved in any of the allegations giving rise to plaintiff's constitutional claims. Dkt. No. 40-7 at 5-8.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally

protected characteristic."). To prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

As the former Executive Director of the CNYPC and Commissioner of the OMH, respectively, defendants Sawyer and Hogan cannot be liable for damages under section 1983 solely by virtue of being supervisors, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Instead, to establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007),

*rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009);

*see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865,

873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

The evidence before the court with respect to the personal

involvement of both defendants Sawyer and Hogan is similar. In his

amended complaint, plaintiff contends that he sent letters to those

individuals complaining about being unable to access his personal

belongings in long-term storage "to no avail." Dkt. No. 5 at 3. At his

deposition, plaintiff originally stated that he could not recall if he ever

received a response from defendant Hogan regarding his complaints

about his property in long-term storage. *See* Dkt. No. 40-1 at 44. Later in

the deposition, however, plaintiff testified as follows:

> Q   Is there a letter from the Commissioner telling
>      – dealing with the papers that you didn't get
>      originally? Did you ever get anything from the
>      Commissioner about that? About the stuff
>      what you are talking about today?
> A   Yes.
> Q   Okay. What did it say?
> A   Basically, it's up to Nowicki and his staff.
> Q   Okay. So Sawyer said it's up to Nowicki.
>      Sawyer is the director.
> A   Everybody says it's up to him
> Q   Okay. I just wanted to go through them all.
>      Sawyer says, 'I defer to Nowicki?'"
> A   Right.
> Q   And then Hogan says it's up to Nowicki?
> A   Right.

Dkt. No. 40-1 at 56-57.

Although defendant Hogan has no independent recollection of plaintiff or his individualized needs, Dkt. No. 40-3 at 5, the record reflects that defendant Hogan received a letter from the plaintiff and referred the matter to John Culkin, the Director of the Bureau of Sex Offender Evaluation and Treatment at the OMH. Dkt. No. 40-1 at 71. Culkin, in turn, informed plaintiff that, because the CNYPC was already investigating plaintiff's complaints, "it would be inappropriate for the Central Office to become involved in [his] case." *Id.* Because it is well established that a supervisor cannot be deemed personally involved if he refers the matter to a subordinate for response or investigation, and because there is no additional evidence that demonstrates defendant Hogan's involvement in plaintiff's allegations regarding his property in long-term storage, I recommend the court dismiss the claims asserted against defendant Hogan. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *accord, Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009).

With respect to defendant Sawyer, the only evidence implicating him in the allegations that plaintiff was denied access to his property in long-term storage is plaintiff's deposition testimony that, in response to a letter, defendant Sawyer deferred to defendant Nowicki's decisions. *See, e.g.,*

Dkt. No. 40-1 at 56-57. Neither the letter from plaintiff to defendant Sawyer nor that from defendant Sawyer to plaintiff is in the record for the court to verify this testimony. While denying any independent recollection of plaintiff's specific requests in his declaration submitted in support of defendants' motion, defendant Sawyer states that, in the ordinary course of business, he would "assign staff to investigate the complaint." Dkt. No. 40-5 at 3, 5. In addition, although defendant Sawyer explains that plaintiff's attorney wrote to him in January 2011, regarding a search of plaintiff's room, that incident is not related to plaintiff's allegations that he has been denied access to his belongings in long-term storage. *Id.* at 4. Based on the evidence before the court, I find that a genuine dispute of material fact exists as to whether defendant Sawyer received plaintiff's letter and independently investigated his complaints before responding. Although it certainly seems plausible that, like defendant Hogan, defendant Sawyer may have referred the matter to a subordinate for investigation, the absence of any independent evidence to verify defendant Sawyer's suspicion that he did, in fact, refer it is enough to raise a genuine dispute of material fact. Plaintiff consistently testified at his deposition that defendant Sawyer responded to his letter and deferred to defendant Nowicki's decisions. Dkt. No. 40-1 at 41, 56-57. Defendant Sawyer, on the

other hand, has only provided evidence suggesting that, notwithstanding

his failure to independently recall plaintiff's individualized needs, he would

have referred the matter to a subordinate in the ordinary course of

business. Dkt. No. 40-5 at 3, 5. Based on the evidence, I find that a

reasonable factfinder could conclude, if plaintiff's testimony is credited,

that defendant Sawyer learned about plaintiff's alleged constitutional

violations and failed to remedy them by simply deferring to defendant

Nowicki's decisions. Accordingly, I recommend the defendants' motion be

denied to the extent it seeks dismissal of plaintiff's claims against

defendant Sawyer based on lack of personal involvement.

C.    Plaintiff's Access to Courts Claim[8]

Defendants also seek dismissal of plaintiff's First Amendment denial

of access to the courts claim based on their contention that no reasonable

factfinder could conclude that (1) plaintiff suffered any prejudice as a result

---

[8]      Plaintiff characterizes this claim in his complaint in various ways, including
describing defendants conduct as violating the First, Fifth, Sixth, and Fourteenth
Amendments. *See generally* Dkt. No. 5. Although it could be construed as a
substantive due process claim brought under the Fourteenth Amendment, the
Supreme Court has instructed that, "where a particular Amendment provides an explicit
textual source of constitutional protection against a particular sort of government
behavior, that Amendment, not the more generalized notion of substantive due
process, must be the guide for analyzing [the] claims." *Cnty. of Sacramento v. Lewis*,
523 U.S. 833, 842 (1998) (quotation marks omitted); *Butler v. Hogue*, No. 08-CV-0264,
2010 WL 4025886, at *2 (N.D.N.Y. Oct. 13, 2010) (Sharpe, J.). Thus, plaintiff's causes
of action related to his allegations of the denial of access to his legal papers should be
analyzed under the First Amendment, applicable through the Fourteenth Amendment,
rather than as asserting a substantive due process cause of action.

of defendants' actions, or (2) defendants acted deliberately and maliciously. [Dkt. No. 40-7 at 9-13](Dkt. No. 40-7 at 9-13).

Undeniably, prisoners have a constitutional right to meaningfully access the courts. *Bounds v. Smith*, 430 U.S. 817, 824 (1977); *accord*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of *access to the courts*." (emphasis in original)). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents, or file them[.]" *Lewis*, 518 U.S. at 350 (citations omitted). A plaintiff asserting a denial of access to courts claim must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quotation marks omitted). To establish a denial of access to courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis*, 320 F.3d at 351. Second, a plaintiff must demonstrate that he suffered an actual injury. *Id.*

### 1. Actual Injury

Plaintiff contends that he was prejudiced by defendants' refusal to allow him access to his legal papers in long-term storage since he arrived at the CNYPC in April 2010, because he was precluded from filing an

16

appeal in two particular cases, both of which plaintiff was unable to identify except to describe the first as a federal court case filed in this district, related to good time credits, and the second as a state court case concerning parole. Dkt. No. 5 at 1, 5; Dkt. No. 40-1 at 14-15, 33-34, 61-62. Plaintiff contends that, because he was denied access to his papers, he cannot provide the case numbers or any other identifying information for these actions. Dkt. No. 5 at 9.

According to the Federal Judiciary's Public Access to Court Electronic Records ("PACER") system, aside from this pending lawsuit, plaintiff has filed three actions in the Northern District of New York, including (1) *Roache v. Schneiderman* ("*Roache I*"), No. 12-CV-1034 (N.D.N.Y. filed June 26, 2012); (2) *Roache v. Connell* ("*Roache II*"), No. 09-CV-1302 (N.D.N.Y. filed Nov. 20, 2009); and (3) *Roache v. Connell* ("*Roache III*"), No. 06-CV-0200 (N.D.N.Y. filed Feb. 15, 2006). Because *Roache I* was commenced by plaintiff after his transfer into the CNYPC and judgment was entered closing *Roache III* in 2006, years before his arrival at the CNYPC, those actions cannot be the ones to which plaintiff refers when he contends, in this case, that he was denied access to his legal papers concerning good time credits. In addition, *Roache I* was a civil rights action asserting a due process claim based on an allegation

that plaintiff was unlawfully detained in the CNYPC, and did not involve good time credits. *See generally Roache I*, No. 12-CV-1034, [Dkt. No. 1]. In the same vein, plaintiff filed a petition for writ of habeas corpus in *Roache III* that sought review of state court decisions and did not concern good time credits. *See generally Roache III*, No. 06-CV-0200, [Dkt. No. 7]. Plaintiff's petition for writ of habeas corpus in *Roache II*, however, does contain allegations regarding good time credits, and the case was pending at the time plaintiff was transferred into the CNYPC. *See generally Roache II*, No. 09-CV-1302. Accordingly, for purposes of this action, I have assumed that plaintiff is referring to *Roache II* when he contends he was denied access to his legal papers concerning a federal court case filed in this district involving good time credits.[9]

Turning now to whether plaintiff suffered an actual injury from the alleged denial of access to his papers in connection with *Roache II*, plaintiff contends that the lack of access precluded him from appealing the dismissal of his petition. *See, e.g.,* [Dkt. No. 5 at 10]; [Dkt. No. 40-1 at 15]. On February 22, 2012, Senior District Judge Frederick J. Scullin, Jr., issued a decision and order dismissing plaintiff's petition in *Roache II*

---

[9]    At his deposition in connection with this matter, plaintiff testified that he believed he commenced the federal court case to which he refers "in 2007 or something like that." [Dkt. No. 40-1 at 15]. According to PACER, however, plaintiff did not commence any action in this district in 2007.

based on multiple grounds, including that plaintiff asserted claims that are not cognizable on federal habeas review. *Roache II*, No. 09-CV-1302, Dkt. No. 28. Plaintiff does not allege, and there is no indication from the docket sheet in *Roache II*, that he did not receive this decision and order. To appeal the order, plaintiff would have been required to file a motion with the Court of Appeals for the Second Circuit requesting the issuance of a certificate of appealability ("COA") since Judge Scullin did not issue one, finding that plaintiff had "failed to make a substantial showing of the denial of a constitutional right as 28 U.S.C. § 2253(c)(2) requires[.]" Dkt. No. 28 at 14 (quotation marks omitted). Pursuant to 28 U.S.C. § 2253, "[u]nless a circuit justice or judge issues a [COA], an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). The Second Circuit requires any motion for a COA to include the following materials:

> (1) the Court's Form T-1080 Motion Information Statement, (2) a copy of the district judge's decision denying the COA, and (3) a statement that (a) identifies each issue to be raised on appeal and the relevant facts and (b) makes a substantial showing of the denial of a constitutional right as to each issue.

HOW TO FILE HABEAS CORPUS PETITIONS OR APPEALS,

http://www.ca2.uscourts.gov/clerk/case_filing/appealing_a_case/pdf/How

%20to%20File%20a%20Prisoner%20Habeas%20Appeal.pdf (last visited

July 29, 2015). Assuming it is true that, as plaintiff alleges, he was not

granted access to his legal papers regarding *Roache II* after arriving at the

CNYPC in April 2010, a reasonable factfinder could conclude that plaintiff

would have been unable to "make[] a substantial showing of the denial of

a constitutional right" without access to those papers. Depending on the

issues raised in plaintiff's motion for COA, it seems likely he would need to

refer to his legal papers in connection with the action. For this reason, I

find the record before the court gives rise to a genuine dispute of material

fact as to whether plaintiff suffered an actual injury with respect to

defendants' alleged decision to deny plaintiff access to his legal papers in

long-term storage concerning the federal court case to which plaintiff

refers.[10]

---

[10]     It is worth noting that the docket sheet in *Roache II* reflects that plaintiff was able to, and did, contact the court on two occasions between the time that he was transferred into the CNYPC and when Judge Scullin dismissed his petition. *Roache II*, No. 09-CV-1302, Dkt. Nos. 24, 26. In a letter dated September 27, 2010, plaintiff requested a status update regarding the action and identified the matter with the correct case number. *Roache II*, No. 09-CV-1302, Dkt. No. 24 at 1. On or about July 1, 2011, plaintiff again wrote a letter to the court requesting he be released "on his own recognizance or on reasonable bail." *Roache II*, No. 09-CV-1302, Dkt. No. 26. These letters rebut plaintiff's allegation that he did not have the case numbers for any of the actions to which his legal papers in long-term storage relate. The letters do not,

As it relates to plaintiff's contention that he could not appeal one of his cases filed in state court regarding parole, defendants have provided a list of all of plaintiff's cases filed in New York State and argue that "there is no admissible evidence that any deadline to file a notice of appeal or perfect an appeal was missed because the plaintiff could not access documents." Dkt. No. 40-7 at 10-11; Dkt. No. 40-1 at 185-200. This contention, however, ignores plaintiff's allegations contained both in his verified complaint and his deposition testimony – both of which constitute admissible evidence – that he was unable to file an appeal in connection with a state court case concerning parole. Dkt. No. 5 at 5, 9, 13, 14; Dkt. No. 40-1 at 15, 62-63. Defendants have offered only a list of plaintiff's state cases, without any accompanying context, docket sheets, or proof that would demonstrate that plaintiff's lack of access to his legal papers did not cause him to miss an opportunity to file an appeal. Accordingly, because there is nothing in the record that disputes plaintiff's testimony

---

however, provide any meaningful evidence that plaintiff was not denied access to the legal papers. In this regard, the letters merely reflect that plaintiff could access the court with respect to *Roache II*, not that defendants did not deny him access to his legal papers in connection with the action. Nevertheless, it is curious that plaintiff did not complain to the court in either of the letters about being denied access to his legal papers. It is also noteworthy that plaintiff also failed to claim that he was denied access to his legal papers in his notice of appeal to the Second Circuit of Judge Scullin's decision dismissing the habeas petition in *Roache II*, which plaintiff filed on July 15, 2015. *Roache II*, No. 09-CV-1302, Dkt. No. 30. While the absence of any complaint in these filings raises a suspicion regarding the plausibility of plaintiff's allegations, it does not necessarily disprove them.

concerning whether he was precluded from filing an appeal, I find that a genuine dispute of material fact exists as to whether plaintiff suffered an actual injury by defendants' alleged failure to allow plaintiff access to his legal papers.

2.    <u>Deliberate and Malicious Intent</u>

To succeed on his court access claim, plaintiff must also show, in addition to actual injury, that defendants acted deliberately and maliciously in denying him access. *See, e.g., Dawes v. VanBenschoten*, 21 F. App'x 29, 31 (2d Cir. 2001) (citing *Morello v. James*, 810 F.2d 344, 347 (2d Cir. 1987)). This inquiry turns on whether the defendant under consideration "intended to hinder a plaintiff's ability to obtain a remedy in a court of law." *Rodriguez v. Diaz*, No. 05-CV-1831, 2011 WL 3427147, at *3 (S.D.N.Y. Aug. 3, 2011); *see also Davis*, 320 F.3d at 351 ("To state a claim for denial of access to the courts. . .a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim."); *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1989) (finding the *pro se* plaintiff's complaint stated a claim for denial of access to the courts where the complaint could "reasonably be read to allege that state prison officials intentionally violated [the plaintiff's] right of reasonable access to the courts"). Because I have recommended dismissal of

plaintiff's claims against defendant Hogan based on lack of personal involvement, I have analyzed this element of plaintiff's denial of access to the courts claim only as against defendants Sawyer, Nowicki, and Ferguson.

i.    Defendant Sawyer

The only evidence regarding defendant Sawyer's involvement in allegedly denying plaintiff access to the courts is plaintiff's testimony that, in response to a letter from plaintiff complaining of being denied access to his property in long-term storage, defendant Sawyer deferred to defendant Nowicki's decisions. *See, e.g.,* Dkt. No. 40-1 at 56-57. Neither the letter from plaintiff to defendant Sawyer nor that from defendant Sawyer to plaintiff is in the record and available to corroborate this testimony. Even assuming he failed to remedy plaintiff's complaints, and was thus personally involved, there is no record evidence upon which a reasonable factfinder could conclude that defendant Sawyer acted deliberately and maliciously. Accordingly, I recommend plaintiff's access to the courts claim asserted against defendant Sawyer be dismissed on this basis.

ii.    Defendant Nowicki

The record is similarly devoid of any evidence from which a reasonable factfinder could conclude that defendant Nowicki acted

deliberately and maliciously. The record reflects that defendant Nowicki responded to plaintiff's letters, in which he complained of being denied access to his property in long-term storage, and informed plaintiff he would contact defendant Ferguson in an attempt to remedy the situation. Dkt. No. 40-1 at 19. In addition, defendant Nowicki was present at the hearing before Justice Clark concerning plaintiff's Article 78 petition and seemingly cooperated with the judge and plaintiff's own attorney in accommodating plaintiff's requests. *Id.* at 123. According to plaintiff's own testimony, while he was examining his legal papers held in long-term storage on September 6, 2011, defendant Nowicki appeared and asked whether "'everything was going all right.'" *Id.* at 32. In light of this evidence, and the lack of any evidence to suggest defendant Nowicki intentionally denied plaintiff access to his legal papers, no reasonable factfinder could conclude that defendant Nowicki acted deliberately and maliciously in denying plaintiff access to the courts. Accordingly, I recommend that this claim be dismissed as against defendant Nowicki.

iii.    <u>Defendant Ferguson</u>

Plaintiff alleges defendant Ferguson denied him access to his legal papers by continuously refusing to retrieve plaintiff's papers from long-term storage and denying plaintiff permission to store any of his legal

24

documents, apparently in violation of Justice Clark's order. Dkt. No. 5 at 7, 9; Dkt. No. 40-1 at 33. At his deposition, plaintiff testified that, when he made an inquiry to defendant Ferguson regarding his long-term storage requests, defendant Ferguson responded, "'If you keep writing, I am never going to answer you.'" Dkt. No. 40-1 at 22. Defendant Ferguson also allegedly told plaintiff that he "didn't care what [Justice Clark] said" and denied plaintiff permission to hold onto any of his papers in long-term storage. Dkt. No. 5 at 4; Dkt. No. 40-1 at 33.

Defendant Ferguson, on the other hand, contends that he "retrieved the item/items [in long-term storage requested by plaintiff] to the best of his abilities" when plaintiff submitted requests. Dkt. No. 40-2 at 4. He and defendant Nowicki also maintain that, contrary to plaintiff's allegation that defendant Ferguson ignored Justice Clark's order on September 6, 2011, plaintiff became hostile and "expressed no interest in sorting his documents or property, turned and walked out of the room." *Id.* In viewing the foregoing evidence in the light most favorable to plaintiff, I find that a reasonable factfinder could infer, if plaintiff's testimony is credited, that defendant Ferguson deliberately and maliciously interfered with his access to the courts by denying him access to his legal papers in long-term storage.

In summary, although there exists a genuine dispute of material fact with respect to whether plaintiff suffered an actual injury in connection with his alleged lack of access to his legal papers, a reasonable factfinder could conclude that only defendant Ferguson denied plaintiff access to this property with the requisite intent.[11]

D.   Plaintiff's Retaliation Claim

In their motion, defendants also seek dismissal of plaintiff's retaliation claim asserted against all of them based on plaintiff's failure to "identify any alleged reason why [they] would do so." Dkt. No. 40-7 at 13.

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government

---

[11]     Defendants implicitly contend that plaintiff was denied access to his property in long-term storage, including his legal papers, because allowing him to do so would violate CNYPC rules regarding the limits on storing personal property in his room. Dkt. No. 40-7 at 11. There is no record evidence to support this conclusion. While defendants Ferguson and Nowicki explain the CNYPC rule regarding the limitations on personal property storage in their declarations submitted in support of the pending motion, they fail to provide necessary context by adducing evidence that plaintiff violated this rule at any time or that plaintiff was denied access to his property because doing so would create a violation of the rule. *See* Dkt. No. 40-2 at 2-3; Dkt. No. 40-4 at 2-3. Accordingly, to the extent defendants seek to evade liability on plaintiff's access to the courts claim on the basis that they were enforcing a policy reasonably related to legitimate penological interests, *Arce v. Walker*, 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999), I find there is no evidence to support a conclusion that plaintiff violated any CNYPC policy.

takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.). "[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similar situated individual or ordinary firmness from exercising his or her constitutional rights.'" *Alicea v. Howell*,

387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

In this case, liberally construed, plaintiff's complaint asserts a retaliation claim against the defendants based on an allegation that they precluded him access to his legal papers in long-term storage in retaliation for his filing the Article 78 proceeding. Dkt. No. 5 at 3-4, 14. The filing of an Article 78 proceeding is a protected activity under the First Amendment, *see, e.g., Cabassa v. Gummerson*, No. 01-CV-1039, 2008 WL 4416411, at *22 (N.D.N.Y. Sept. 24, 2008) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.), and depriving an inmate access to legal papers may constitute adverse action, *see, e.g., Smith v. City of N.Y.*, No. 03-CV-7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005). Thus, the question in this case is whether there is sufficient record evidence from which a reasonable factfinder could conclude that there is a causal connection between plaintiff's filing of the Article 78 petition and defendants' alleged denial of access to his legal papers.

1.    Defendant Ferguson

With respect to defendant Ferguson, there is evidence that, in denying plaintiff permission to store any legal papers from long-term storage in his room on September 6, 2011, defendant Ferguson told

plaintiff he "did not care who said what" and that "he didn't care what [Justice Clark] said, he was doing what he wants, and that [plaintiff] wasn't getting nothing [sic]." Dkt. No. 5 at 4. Assuming these allegations are true, a reasonable factfinder could infer that defendant Ferguson was motivated by plaintiff's Article 78 petition in denying plaintiff permission to store his property. Although defendant Ferguson did not explicitly credit plaintiff's Article 78 proceeding for his decision to deny plaintiff permission, when these statements are considered in conjunction with the evidence demonstrating that, in April and August 2010, approximately a year prior to the Article 78 hearing before Justice Clark in August 2011, he was granted at least some access to his property in long-term storage, Dkt. No. 40-1 at 121; Dkt. No. 40-2 at 4, a factfinder could conclude that it was the Article 78 proceeding that motivated defendant Ferguson to deny plaintiff permission to store his property in his room on September 6, 2011. Said differently, the record demonstrates that, while defendant Ferguson may have denied plaintiff access to his property in long-term storage for a certain period of time after plaintiff was transferred into the CNYPC, Dkt. No. 5 at 7, 9, 10; Dkt. No. 40-1 at 16-17, there is also evidence that defendant Ferguson, as the property manager for the CNYPC, granted plaintiff's requests for access before the Article 78 hearing. *See e.g.,* Dkt.

No. 40-1 at 121; Dkt. No. 40-2 at 4. Defendant Ferguson's statements on September 6, 2011, which reference the hearing, could give rise to an inference that, on that date, he intended to retaliate against plaintiff for obtaining a favorable ruling from Justice Clark. In addition, when defendant Ferguson's statements from September 6, 2011, are considered in conjunction with plaintiff's allegation that he had earlier told plaintiff that he would never respond if plaintiff continued to write letters requesting access to his long-term storage, it seems reasonable that a factfinder may conclude that defendant Ferguson developed a pattern of retaliatory conduct with respect to plaintiff and his requests for access to his property in long-term storage.[12] For these reasons, I recommend the court deny defendants' motion with respect to plaintiff's retaliation claim asserted against defendant Ferguson.

---

[12] Although plaintiff testified at his deposition that defendant Ferguson warned him that, if he continued to write letters, defendant Ferguson would not respond, I do not construe this as asserting a retaliation claim based on defendant Ferguson's alleged refusal to answer plaintiff's letters or provide plaintiff with access to his property in long-term storage out of retaliation for plaintiff writing his letter requests. Plaintiff's complaint does not contain allegations to this effect, and the primary focus of plaintiff's complaint, deposition testimony, and opposition to the pending motion is on his denial of court access claim.

2.    Defendant Nowicki

Turning to defendant Nowicki, plaintiff alleges in his complaint that, after the Article 78 hearing, defendant Nowicki "allowed [defendant] Ferguson to continue with [his] abuse of authority and commit contempt of court[.]"[13] Dkt. No. 5 at 14. Additionally, when asked if he wrote to defendant Nowicki after September 6, 2011, at which time defendant Ferguson refused to allow plaintiff to store some of his property in his room, plaintiff responded that he wrote to defendant Nowicki "off and on throughout the months" because more papers were subsequently confiscated after that date. Dkt. No. 40-1 at 46. Plaintiff also testified that he wrote letters to "everybody" after he was denied his legal papers on September 6, 2011. *Id.* at 44, 46. Even assuming all of this is true, however, it does not give rise to a genuine dispute of material fact with respect to whether defendant Nowicki's actions were motivated by retaliatory intent for plaintiff filing an Article 78 petition. Plaintiff's vague allegation that he wrote "everybody" after September 6, 2011, apparently with no satisfactory response, fails to demonstrate that defendant Nowicki retaliated against plaintiff for engaging in any protected activity. Instead,

---

[13]    In his complaint and during his deposition in connection with this matter, plaintiff consistently characterized defendant Ferguson's refusal to give him his legal papers after the Article 78 hearing as "contempt of court." Dkt. No. 5 at 12; Dkt. No. 40-1 at 37.

the evidence demonstrates that defendant Nowicki was cooperative during and after the Article 78 proceeding, answering Justice Clark's questions, scheduling the meeting on September 6, 2011, for plaintiff to organize his legal papers pursuant Justice Clark's order, and checking-in during the meeting to be sure "'everything [was] going all right.'" [Dkt. No. 40-1 at 32](), 137, 146, 154; [Dkt. No. 40-4 at 69]().

Even construing the evidence in the light most favorable to plaintiff, no reasonable factfinder could conclude that defendant Nowicki retaliated against plaintiff for filing an Article 78 petition. Accordingly, I recommend the court dismiss plaintiff's retaliation claim asserted against defendant Nowicki.

### 3. Defendants Hogan and Sawyer

As for defendants Hogan and Sawyer, there is no record evidence from which a reasonable factfinder could conclude that either of these defendants took adverse action against plaintiff in retaliation for plaintiff filing an Article 78 petition. With respect to defendant Sawyer, there is no evidence that he was aware of the Article 78 proceeding. As to defendant Hogan, while plaintiff alleges in his complaint that defendant Hogan became aware of the Article 78 proceeding through defendant Nowicki, these are conclusory and insufficient to support a finding that defendant

Hogan's conduct was motivated by plaintiff's protected activity. [Dkt. No. 5 at 14](). Even assuming, however, that defendant Hogan learned of the Article 78 proceeding, the only evidence regarding the alleged adverse action by defendant Hogan is plaintiff's allegation that, after the incident with defendant Ferguson on September 6, 2011, he wrote "everybody" – without alleging or otherwise providing any proof that (1) "everybody" included defendant Hogan, (2) defendant Hogan failed to respond to plaintiff's satisfaction, or (3) assuming defendant Hogan failed to respond to plaintiff's satisfaction, he did so with retaliatory animus for the Article 78 proceeding. Accordingly, in light of the absence of any evidence from which a reasonable factfinder could conclude that either defendant Sawyer or defendant Hogan retaliated against plaintiff for filing an Article 78 proceeding, I recommend the court grant defendants' motion with respect to plaintiff's retaliation claim asserted against these individuals.

E.    Plaintiff's Sixth Amendment Claim

To the extent plaintiff asserts a Sixth Amendment claim based on his allegation that defendant Ferguson violated the attorney-client privilege by remaining present for plaintiff's review of his property on September 6, 2011, I recommend it be dismissed. The Sixth Amendment "only protect[s] the attorney-client relationship from intrusion in the criminal setting[.]"

*Wolff v. McDonnell*, 418 U.S. 539, 576 (1974). Because plaintiff's allegations regarding defendant Ferguson's conduct do not arise in the context of a criminal proceeding, plaintiff has failed to assert a cognizable constitutional right.

    F.    <u>Qualified Immunity</u>

Defendants contend that they are all entitled to qualified immunity because "it was objectively reasonable for [them] to believe that they were not violating plaintiff's constitutional rights." Dkt. No. 40-7 at 15. Because I have recommended the dismissal of all claims against defendants Nowicki, Hogan, and Sawyer, I will proceed with analyzing defendants' qualified immunity argument with respect to only plaintiff's court access claim and retaliation claims against defendant Ferguson.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment,

distraction, and liability when they perform their duties reasonably."

*Pearson*, 555 U.S. at 231. Government officials are shielded from liability

by qualified immunity when making "reasonable mistakes" concerning the

lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*,

533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555

U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a

mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985),

the Supreme Court has "repeatedly . . . stressed the importance of

resolving immunity questions at the earliest possible stage in the

litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S.

224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from

suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d

Cir. 2011). Specifically, the inquiry turns on whether the facts alleged,

taken in a light most favorable to the plaintiff, show that the conduct at

issue violated a statutory or constitutional right, and if so, whether that

right "was clearly established at the time of the challenged conduct."

*Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132

S. Ct. at 2093). The Supreme Court has said that an officer's "conduct

violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, plaintiff's rights to access the courts and to be free from retaliation for engaging in a protected activity were firmly established at the time defendant Ferguson allegedly violated those rights, and defendants do not contest this point. Instead, defendants argue that, even

assuming defendant Ferguson did violate plaintiff's rights, he lacked the requisite knowledge, "constructive or actual, that [his] conduct violated plaintiff's constitutional rights." Dkt. No. 40-7 at 15. This contention, however, is not borne out in the record. The record exposes genuine disputes of material fact with respect to whether defendant Ferguson denied plaintiff access to his legal papers with the requisite deliberate and malicious intent and whether he did so with retaliatory animus for plaintiff filing an Article 78 petition in state court. In his declaration submitted in support of the pending motion, defendant Ferguson states that he "retrieved the item/items [requested by plaintiff]" on different occasions, and that he was present on two occasions while plaintiff went through and sorted some of his property held in long-term storage. Dkt. No. 40-2 at 4. This evidence, however, fails to resolve the disputes of material fact regarding plaintiff's access to courts and retaliation claims, and, accordingly, precludes a finding of qualified immunity at this juncture. Assuming a reasonable factfinder credits plaintiff's allegations regarding defendant Ferguson's conduct, no reasonable person in defendant Ferguson's position would believe that he was not violating plaintiff's rights. Moreover, as was noted above, to the extent defendants seek to rely on a CNYPC policy regarding the amount of personal property a

resident may store in his room as justification for their conduct, there is no evidence in this matter that plaintiff violated this rule or that he would have violated this rule had defendant Ferguson permitted him to access his legal paper in long-term storage, as requested on numerous occasions by plaintiff. Accordingly, I recommend the court deny defendants' motion to the extent it seeks a finding of qualified immunity.

IV.     SUMMARY AND RECOMMENDATION

Although no reasonable factfinder could conclude that defendants Nowicki, Sawyer, and Hogan violated plaintiff's rights to access the courts or to be free from adverse action in retaliation for engaging in protected activity, the record now before the court contains genuine disputes of material fact regarding whether defendant Ferguson deliberately and maliciously denied plaintiff access to his legal papers in long-term storage and whether he did so out of retaliation for plaintiff's filing of an Article 78 petition in state court. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 40) be GRANTED in part and DENIED in part, as follows:

(1)     All of plaintiff's claims asserted against defendants Nowicki, Sawyer, and Hogan be DISMISSED; and

(2)    Plaintiff's denial of access to the courts and retaliation claims

asserted against defendant Ferguson survive defendants' motion and be

set down for trial.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:    August 7, 2015
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

1994 WL 23069
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dale HENDRICKSON, Plaintiff,

v.

UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.    |    Jan. 24, 1994.

**MEMORANDUM AND ORDER**

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale Hendrickson ("Plaintiff" or "Hendrickson"), an inmate then in confinement at the Federal Correctional Institution in Otisville, New York ("Otisville"), filed this action for injunctive relief and damages based upon alleged violations of his rights under the United States Constitution, Amendments I, IV, V, VI, IX, and XIII, and upon violations of various laws and/or regulations governing prison administration.[1] The Complaint named as defendants G.L. Hershberger ("Hershberger"), the United States Attorney General ("Attorney General"), Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"), Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the Bureau of Prisons ("BOP"), and the Otisville Medical Department ("OTV Medical Department") (collectively "Defendants"). Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set out below, Defendants' Rule 12(c) motion is granted.

**I.**

Defendants move to dismiss Plaintiff's Complaint, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. Rule 12(c) provides:

> After the pleadings are closed but within such time as not to delay the

trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are employed for dismissing a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a Rule 12(c) motion to dismiss for failure to state a claim upon which relief can be granted. *See Ad–Hoc Comm. of the Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987); *see also Viacom Int'l. Inc. v. Time, Inc.,* 785 F.Supp. 371, 375 n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R. Miller, *Federal Practice and Procedure* ¶ 1367, at 515–16 (1990). Thus, the Court must read the Complaint generously, drawing all reasonable inferences from the complainant's allegations. *See California Motor Transp. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972). Moreover, "consideration is limited to the factual allegations in [the] amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142 (2d Cir.1993); *accord Allen v. Westpoint– Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 112 S.Ct. 1561 (1992); *Frazier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). Defendants, therefore, are entitled to dismissal for failure to state a claim only if the Court finds beyond a doubt that "plaintiff can prove no set of facts" to support the claim that plaintiff is entitled to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for

summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied, 464 U.S. 864 (1983).* Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied, 489 U.S. 1065 (1989).* A complaint that fails to make any specific factual allegations of "direct

and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

### *Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

### **All Citations**

Not Reported in F.Supp., 1994 WL 23069

## Footnotes

1    The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

2    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

---

**End of Document**                                                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4025886
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Keith Terrell BUTLER, Plaintiff,
v.
J. HOGUE, Correction Officer, Upstate Correctional
Facility; and J. Hyde, Correction Officer,
Upstate Correctional Facility, Defendants.

No. 9:08–cv–264 (GLS/DRH). | Oct. 13, 2010.

**Attorneys and Law Firms**

Keith Terrell Butler, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General,
Adele M. Taylor–Scott, Assistant Attorney General, Albany,
NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

*1 Plaintiff Keith Terrell Butler, an inmate at Clinton
Correctional Facility, brings this action under 42 U.S.C. §
1983 against defendants J. Hogue and J. Hyde. (Compl.,
Dkt. No. 1.) Butler alleges that during his incarceration at
Upstate Correctional Facility, Hyde and Hogue violated his
First, Eighth, and Fourteenth Amendment rights by serving
Butler a contaminated kosher meal on one occasion and
soup in a defective container the following day. (*Id .; see
also* Pl. Objections, Dkt. No. 48.)Butler moved for summary
judgment and Hogue and Hyde cross-moved for judgment
on the pleadings. (Dkt.Nos.36, 40.)On February 4, 2010,
Magistrate Judge David R. Homer issued a Report and
Recommendation Order (R & R) recommending that Butler's
motion be denied, that Hogue and Hyde's cross-motion
for judgment on the pleadings be converted into a cross-
motion for summary judgment, and that the cross-motion be
granted, dismissing Butler's complaint in its entirety. (Dkt.
No. 46.)Pending are Butler's objections to the R & R. (Dkt.
No. 48.)For the reasons that follow, the R & R is adopted in
its entirety.

### II. *Standard of Review*

Before entering final judgment, this court routinely reviews
all report-recommendations in cases it has referred to a
magistrate judge. If a party has objected to specific elements
of the magistrate judge's findings and recommendations, this
court reviews those findings and recommendations de novo.
*See* Almonte v. N.Y. State Div. of Parole, No. 04–cv–484,
2006 WL 149049, at *6–7 (N.D.N.Y. Jan. 18, 2006). In those
cases where no party has filed an objection, or only a vague
or general objection has been filed, this court reviews the
findings and recommendations of a magistrate judge for clear
error. *See id.*

### III. *Discussion*

Based on Bulter's submission of various documents outside
the pleadings in support of his summary judgment motion
and defendants' consequent reference to and reliance on
those documents, Judge Homer recommended that Hogue and
Hyde's Rule 12(c) cross-motion to dismiss be converted into
a motion for summary judgment. (*See* R & R at 5, Dkt. No.
46.)Hogue and Hyde raise no objections to the R & R or the
conversion of their motion. The court finds no error in this
conversion.

Butler raises no objection to Judge Homer's conclusion that
any infringement on his First Amendment rights was de
minimis and that Butler's complaint therefore fails to state any
First Amendment claim as to which relief can be granted. (*Id.*
at 7–9.)The court concurs in that conclusion. Butler also does
not protest the denial of his motion to amend his statement of
material facts. (*Id.* at 2 n. 3.) Because no reason was given for
the request, the court affirms the denial of the motion.

Construing Butler's objections liberally, they specifically
challenge Judge Homer's conclusion that his Eighth
and Fourteenth Amendment rights were not violated.
Consequently, those conclusions must be reviewed de
novo. Insofar as the court can consider the challenges
without straying too far from the documents provided
prior to the filing of the objections, Butler's arguments
are without merit. The objections themselves contain
new information relating to Butler's medical condition of
diabetes, previously unmentioned and not suggested by the
submissions, which this court declines to consider for the
first time at this late stage. (*See* Pl. Objections at 2, Dkt. No.

48.)Although a district court has the option to "receive further evidence" when reviewing a magistrate judge's report and recommendation de novo, the court will not do so unless the presenting party offers a sufficient justification for admission. FED. R. CIV. P. 72(b)(3); *see Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999) ("[W]e have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's de novo review."(italics omitted)). Plaintiff has offered no justification for the delay in presenting this evidence and thus the court declines to consider this new claim.

**\*2** Butler raises other additional, and more recent, allegations in his objections. He claims, for example, that he has been retaliated against, that his legal files were stolen, and that he was beaten by correction officers on December 30, 2009. (*See* Pl. Objections at 2–3, Dkt. No. 48.)Again, these claims are beyond the scope of the present cause of action and will not be addressed here.

**A. *Fourteenth Amendment Claims***

Turning to Butler's Fourteenth Amendment due process claims, the R & R observes that it is "unclear how Butler determined that his Fourteenth Amendment rights have been violated."(R & R at 2, Dkt. No. 46.)Whatever the claim's genesis, Judge Homer correctly determined that even taking as true all Butler's pleaded facts and all reasonable inferences drawn therefrom, Butler cannot show that his due process or equal protection rights have been violated and that he is entitled to judgment as a matter of law.

In order for a prisoner to show that his procedural due process rights have been violated, he must first establish that he possessed a protected liberty interest in avoiding the hardship. *See Sandin v. Conner,* 515 U.S. 472, 484 (1995). To show a protected liberty interest, a prisoner must show that the alleged harm "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."*Id.* Butler has pleaded no facts and benefits from no inferences that meet the significant hardship requirement. The absence of any viable liberty interest at stake also compels the conclusion that Hogue and Hyde are entitled to judgment as a matter of law.

The court further notes that Butler can have no substantive due process claim independent of his Eighth Amendment claims. Where there is an explicit textual source of constitutional protection relevant to a claim, that source, rather than substantive due process, governs the analysis.

*Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also County of Sacramento v. Lewis,* 523 U.S. 833, 842–843 (1998). In light of Butler's incarceration, any substantive due process claim would be subsumed in the Eighth Amendment claims present in Butler's submissions.

Butler's Fourteenth Amendment equal protection claims fare no better than his due process claims. To establish an equal protection claim, a plaintiff must show that "he was treated differently from others similarly situated as a result of intentional or purposeful discrimination."*Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). As the R & R points out, nowhere in Butler's submissions is there any evidence of how other similarly-situated inmates were treated with regard to either medical care or the regularity of the provision of meals. At best, Butler can point to one sentence in his affidavit in support of his motion for summary judgment: "plaintiff is entitled to The Equal protection Clause in which I am intentionally being treated differently."(Pl. Mot. at 3, Dkt. No. 36.)This conclusory allegation is insufficient to salvage his equal protection claim. Consequently, Butler's Fourteenth Amendment equal protection claims fail.

**\*3** B. *Eighth Amendment Claims*

Butler objects to the dismissal of his Eighth Amendment claims. Disregarding those objections which present new evidence, his remaining objections are wholly without merit. Butler's submissions prior to his objections contain no allegations that he suffered any physical injury, of any magnitude, as a consequence of the deprivation of the meals. Thus, Butler relies in error on *Hudson v. McMillian,* 503 U.S. 1 (1992). Although *Hudson* rejects a bright-line minimum amount of force required to show excessive force, it also holds that de minimis force fails to establish a constitutional claim unless the particular use of force is "repugnant to the conscience of mankind."*Id.* at 10 (citation and internal quotation marks omitted). Because no physical force or injury is even alleged, no claim based upon excessive force can be sustained. As the R & R rightly points out, "allegations of verbal harassment alone, without physical injury, are not actionable pursuant to § 1983."(R & R at 10, Dkt. No. 46 (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996)).)

Butler's pleadings do not support an Eighth Amendment claim for medical indifference. To establish such a claim, "a plaintiff must prove that the defendant was deliberately indifferent to a serious medical need."*Sledge v. Kooi,* 564

F.3d 105, 108 (2d Cir.2009) (citing *Farmer v. Brennan,* 511 U.S. 825, 834–40 (1994)). No evidence of a serious medical need exists in the submissions under review. The properly pleaded facts bear out, at most, a chronic sore throat for which Butler was provided medical treatment on nine separate occasions in the month that followed the provision of the contaminated meals. (*See* Pl. Mot. at 12–16, Dkt. No. 36.)Even if a reasonable jury could find that Butler's sore throat met the serious medical condition requirement, the requisite mental state of deliberate indifference is clearly absent. First, a defendant must "know of and disregard[ ] an excessive risk" to the plaintiff's health or safety. *Farmer,* 511 U.S. at 837. There is no evidence or allegation in Butler's submissions that either defendant was aware of Butler's medical conditions. Consequently, Butler's Eighth Amendment medical indifference claim fails.

Butler also claims an Eighth Amendment violation due to unsanitary prison conditions stemming from a failure to provide nutritious food. (*See* Pl. Mot. at 3, 5, Dkt. No. 36.)Prisons are required under the Eighth Amendment to provide for the basic human needs of those incarcerated, including "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."*Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (per curium) (citation and internal quotation marks omitted). The deprivation must be sufficient to create a serious danger to the health of the inmate. *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (finding deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward,* 450 F.Supp. 591, 596–597 (W.D.N.Y.1978) (finding denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth

Amendment rights). Where a particular diet is medically required, denial of a smaller number of meals may be sufficient in some circumstances. *See Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles,* 725 F.2d at 15–16). However, the scope of the deprivation of food required to constitute cruel and unusual punishment is significantly greater than the deprivation present here. Deprivation of only two meals over a two-day period is insufficient to make out a constitutional claim. Therefore, the Eighth Amendment claims based on denial of sanitary food fails.

### IV. *Conclusion*

**\*4 WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David R. Homer's February 4, 2010 Order (Dkt. No. 46) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Hogue and Hyde's motion (Dkt. No. 40) is **GRANTED** in all respects and the complaint dismissed; and it is further

**ORDERED** that Bulter's motion (Dkt. No. 36) is DENIED; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4025886

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4416411
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Samuel CABASSA, Plaintiff,

v.

Craig GUMMERSON, Corrections Captain,
Auburn Correctional Facility; Donald Selsky,
Assistant Deputy Commissioner, Director of
Special Housing/Disciplinary Program; Anthony
Graceffo, Chief Medical Officer, Auburn Correctional
Facility; Glenn S. Goord; Hans Walker; Gary
Hodges; D.W. Seitz; Terry Halcott; Christine
Coyne Nancy O'Connor; Ann Driscoll; John
McClellen; John Rourke, Captain, Security Services
at Auburn Correctional Facility; Koors, Head
Pharmacist at Auburn Correctional Facility;
Robrt Mitchell, Correctional Counselor at Auburn
Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.

No. 9:01-CV-1039.  |  Sept. 24, 2008.

**Attorneys and Law Firms**

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Fruchter, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

## ORDER

DAVID N. HURD, District Judge.

*1 Plaintiff, Samuel Cabassa, brought this civil rights action
pursuant to 42 U.S.C. § 1983. In a Report Recommendation
dated June 30, 2008, the Honorable George H. Lowe, United
States Magistrate Judge, recommended that defendants'
second motion for summary judgment (Docket No. 81) be
granted in part and denied in part. Objections to the Report
Recommendation have been filed by the parties.

Based upon a de novo review of the portions of the Report-
Recommendation to which the parties have objected, the

Report-Recommendation is accepted and adopted. *See* 28
U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and
DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in its
entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to the
extent that it asserts:

(a) Any Fourteenth Amendment procedural due process
claim whatsoever;

(b) A First Amendment access to courts claim against
defendant Hans Walker;

(c) A First Amendment retaliation claim against defendant
Hans Walker;

2. Defendants' second motion for summary judgment is
otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts claim
against defendants D.W. Seitz and Craig Gummerson
asserted in the Fourth Amended Complaint's Fifth Cause
of Action; and

(b) Plaintiffs First Amendment retaliation claim against
defendants D.W. Seitz and Craig Gummerson also
asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W.
SEITZ, Correctional Officer, Auburn C.F.; CRAIG
GUMMERSON, Captain, Auburn C.F.,

Defendants.

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.)[1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material[2] fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the moving party.[3]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[4] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[5] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[11] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[12]

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.[13] In one of those actions, he was awarded $1,000 following a jury trial.[14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation

that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience. [15]

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded, [16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State.(*Id.* at 8-10;*see also*Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

**\*4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

### 1. Continuing Violation Doctrine

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to [42 U.S.C. § 1983]), [17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to [42 U.S.C. § 1983]. [18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker

and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine. [19]

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

 **\*5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) [20] Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets."(*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) [21]

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record."(*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf* . Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

**\*6** 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge."(*See*Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare*Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with*Dkt. No. 85, Part 2, ¶ 7 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also*Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [22]

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false. [23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or

of 42 U.S.C. § 1983. [24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See*Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) [25]

**\*7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) [26]

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See*Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally*Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful.

For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [27]

**\*8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it, [28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem

with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

> where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at \*4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6 [23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were

part of an express and openly espoused *policy.*Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims

concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

 **\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See*Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary).*Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures."(Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS. [29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population. [30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population, [31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population

of a New York State correctional facility, [32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be). [33]

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.) [34]

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998. [35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

**\*12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on

January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim,

Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.)In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above.(*Id.*) [36] The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [37]

**\*13** Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground

that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin'* s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly

suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F.

were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

## 2. Claims Under the First Amendment

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

### a. Access-to-Courts Claim

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson.[39]

**\*15** Plaintiff's "Fifth Cause of Action" alleges as follows:

> The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of

"Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.*(Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the

courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [40]

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act. [45]

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [*v. Connor,* 115 S.Ct. 2293 (1995)], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin*], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at \*6–7, 1997 U.S. Dist. LEXIS 11025, at \*21–22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85–

CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted]. [46]

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

> **\*18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ...*or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin* [*v. Connor,* 515 U.S. 472

(1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre,* 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted]. [47]

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. [48] The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

**\*19** Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06-CV-0669, 2007 WL 1030304, at \*4-5, 2007 U.S. Dist. LEXIS 24261, at \*11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady,* 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments).[49] In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party

must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[50] This initial burden, while modest, is not without substance.[51]

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,*Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry[53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998).[54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been

invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional access-to-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay). [55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution."(Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

**\*21** In order to convert the claim raised in this allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of* ] his successful Article 78 [petition] ...." (*Id.*)Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment).(*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration

runs the prison, not the judge."] [internal quotation marks omitted].) [56]

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [57] Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se*. *See Albert v. Carovano,* 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord, Wynder v. McMahon,* 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), *Northrup v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997).

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [58] in his complaint in order to assert a retaliation claim. *See Williams v. Manternach,* 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ...."). [59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how

the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. [60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against

Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him). [61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them). [62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary. [63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground . [64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be *GRANTED* in part and *DENIED* in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be *DISMISSED* in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be *DISMISSED* to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment access-to-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise** *DENIED* so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24 ANY OBJECTIONS** to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [65]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4416411

Footnotes

1   By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

2   A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3   *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

4   Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

5   Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

6   *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

7   *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at \*1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

8    *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

9    (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

10   *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

11   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

12   *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

13   *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

14   *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

15   "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-

Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999)* (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

16  Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See*Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims).*See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

17  (*See*Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,*Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

18  *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by*1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

19  The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

20  Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See*Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

21  Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

22  I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See*Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

23  *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

24  A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a

§ 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab*, 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds*, 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin*, 642 F.Supp. 276, 280 (S.D.N.Y.1986).

25    Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

26    It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin*, 775 F.Supp. 84, 87-88 (W.D.N.Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd*, 970 F.2d 1148 (2d Cir.1992).

27    *See Brown v. Goord*, 04-CV-0785, 2007 WL 607396, at *6 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple*, 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord*, 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

28    It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

29    *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration were less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

30    *See, e.g., Spence v. Senkowski*, 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan*, 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin*, 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky*, 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne*

*v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

31    *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55;*see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

32    *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

33    *See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

34    *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,*2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

35    "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

36    I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See*Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

37    For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]."(*Id.* at 11-12.)

38    (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,*Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also*Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,*Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

39    *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

40    I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

41    "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."*Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

42    *See*U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

43    *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

44    *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

45    *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

46    *Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

47    *Accord, Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

48    Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

49    *Cf. Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

50    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

51  *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown,"*only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

52  *See Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court").

53  (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

54  N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

55  *See Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

56  Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

57  It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) ("*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

58  *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

59  This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the

word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

60  To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

61  (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

62  (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

63  (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning]."] [internal quotation marks omitted].) As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

64  (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

65  *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate") [citation omitted]; *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532,

535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22299359
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy GARRETT, Plaintiff,

v.

Edward REYNOLDS, Superintendent,
Mohawk Corr. Facility; James A. Mance,
Deputy Superintendent of Programs; John

O'Reilly, [1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R.
Centore, Correctional Officer, Defendants.

No. Civ.9:99CV2065NAMGLS. | Oct. 7, 2003.

**Attorneys and Law Firms**

Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

### *REPORT-RECOMMENDATION*

SHARPE, Magistrate J.

### I. *Introduction* [2]

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under 42
U.S.C. § 1983 claiming that the defendants violated his civil
rights when they retaliated against him for his activities as an
IGRC representative by subjecting him to verbal harassment,
physical abuse and subsequently, a transfer. Garrett also
claims that the supervisory defendants failed to properly
investigate his complaints and failed to train/supervise their
employees. This court recommends denying the motion for
summary judgment in part and granting it in part.

### II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his
civil rights under the First, Sixth Eighth, and Fourteenth

Amendments. [3] On September 28, 2001, the defendants filed
a motion for summary judgment. On January 18, 2002, this
court issued an order informing Garrett of his obligation to file
a response and extended his time to respond for thirty days.
On April 24, 2002, this court granted an additional sixty days
to respond to the defendants' motion. Despite having been
given multiple opportunities to respond, Garrett has failed to
file a response.

### III. *Facts* [4]

On June 17, 1999, Garrett filed a grievance against Officer
Kelley for verbal harassment. [5] This grievance was denied by
the Central Office Review Committee (CORC) on July 21,
1999. On March 19, 2000, Garrett filed a grievance claiming
that defendant Burge used intimidation tactics. Defendant
Reynolds investigated the grievance and it was denied based
on a finding that no harassment occurred. Garrett appealed to
the CORC and they denied the grievance on April 5, 2000. On
April 10, 2000, defendant Centore wrote a misbehavior
report against Garrett for creating a disturbance and employee
harassment. On April 12, 2000, Lieutenant Manell presided
over Garrett's Tier 2 disciplinary hearing and he was found
guilty of both charges. He was given a 21 day recreation
penalty, and loss of packages and commissary. However,
his recreation penalty was suspended and deferred. Garrett
appealed the determination and it was affirmed on April 19,
2000.

On April 17, 2000, Garrett filed a grievance against Centore
for harassment. Burge denied his grievance on May 4, 2000,
and subsequently, the CORC denied it. On May 12, 2000,
Garrett sent a letter to Burge concerning further harassment
by Centore. On May 16, 2000, Garrett filed another grievance
against Centore for harassment. His grievance was denied
on May 26, 2000. After Garrett appealed, his grievance
was again denied by the CORC. On June 22, 2000, the
Superintendent's Office received a letter from Garrett alleging
that Centore threw a piece of paper with a picture of a plunger
and the words "always gets the job done" into his cell. He
wrote a grievance against Centore for harassment due to
the paper that he threw into his cell. Burge forwarded the
grievance to the CORC on August 10, 2000. The CORC
accepted the grievance on August 30, 2000, in order to
investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [6] to the Mid-State Correctional Facility.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

### IV. *Discussion*

#### A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999)."When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial."*St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000)."[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"*Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training."*Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise."The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion. [7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

**B.** *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacity. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at *2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

**C.** *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal

connection between the protected speech and the adverse action. *See Dawes v. Walker,*[9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129 (N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[11]

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law,

find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

### D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2003 WL 22299359

### Footnotes

1    In this case, the defendants maintain and the docket confirms that defendant John O'Reilly has never been served. Service must be made upon a defendant within 120 days of filing the complaint or any claims against that defendant will be dismissed. See Fed.R.Civ.P. 4(m). The original complaint, which named O'Reilly, was filed on November 26, 1999, and the amended complaint was filed on July 13, 2001. However, O'Reilly was never served. Since this defendant has never been served, this court lacks jurisdiction over him, and this court recommends the dismissal of this defendant.

2    This matter was referred to the undersigned for a Report-Recommendation by the Hon. Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

3    Although Garrett claims to be raising violations under the Sixth, Eighth, and Fourteenth Amendments, the only viable claim based on this court's interpretation of the complaint is under the First Amendment for retaliation.

4    The facts are taken from the defendants' statement of undisputed material facts since Garrett failed to file a response.

5    Not a party in this suit.

6    The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

7    The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

8    This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

9    Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

10   However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

11   The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3427147
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Nelson RODRIGUEZ, Plaintiff,

v.

Hector DIAZ, Chief Clerk, and John
James, Assistant Clerk of the Bronx
County Supreme Court, Defendants.

No. 05 Civ. 1831(CM)(MD).    |    Aug. 3, 2011.

DECISION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

**\*1** On February 4, 2005, Plaintiff Nelson Rodriguez ("Plaintiff") commenced this *pro se* action pursuant to 42 U.S.C. § 1983 against Defendants Hector Diaz ("Diaz") and John James ("James") (collectively, "Defendants"), as well as an anonymous defendant, "Charlotte Doe," who has not been identified or served.[1] Plaintiff alleges Defendants violated his constitutional right of access to the courts because they allegedly failed to file Plaintiffs Article 78 proceeding for more than five years. On March 25, 2009, this Court denied Defendants' motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(c). Presently before the Court is Defendants' motion for summary judgment on the entirety of Plaintiff s claim. For the reasons that follow, Defendants' motion is granted.

This Court refers the parties to the prior decision in this action for a full discussion of the background and facts in this case. *See Rodriguez v. Diaz,* 2009 WL 790035 (S.D.N.Y. Mar. 25, 2009). This Court assumes that the parties are familiar with the facts set forth in the prior opinion and has incorporated them herein. Therefore, I will deal here only with Defendants' arguments for summary judgment and Plaintiff's rebuttals thereto.

## DISCUSSION

## I. The Legal Standard for Granting a Motion for Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor."*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation."*Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment ."*Anderson,* 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Industries Co.,* 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## II. Defendants are Entitled to Summary Judgment

**\*2** Section 1983 permits an action against a person who, under color of state law, deprives another of a right secured by the United States Constitution or federal law. *See*42 U.S.C. § 1983. A claim under § 1983 requires a showing of (1) the deprivation of a right secured by the Constitution or laws of the United States (2) which has taken place under color of state law. *See Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924 (1982)); *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001). In order to succeed on a claim under § 1983, a plaintiff must show that each named defendant personally violated his or her constitutional rights, and must also establish a tangible connection between the acts of each individual defendant and the alleged injuries. *See Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) ("Because vicarious liability is inapplicable to

*Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Here, Plaintiff has failed to show that he has been deprived of his constitutional right of access to the courts. Because there is no evidence that either Defendant violated Plaintiffs constitutional right, it is not necessary for this Court to consider any other argument raised by Diaz and/or James.

**A. Plaintiffs § 1983 Claim for Denial of Access to Court Is Dismissed**

In order to sustain a claim for denial of access to court "a Plaintiff must allege that the defendant took—or was responsible for-actions that hindered a Plaintiff's efforts to pursue a legal claim" and that these actions caused the Plaintiff to suffer an "actual injury." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (internal quotations omitted); *see also Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) ("In order to establish a violation of a right of access to courts, a Plaintiff must demonstrate that a defendant caused "actual injury" ...*i.e.,* took or was responsible for actions that hindered [a Plaintiffs] efforts to pursue a legal claim ..."); *Lewis v. Casey,* 518 U.S. 343, 353 (1996). Therefore, in order to prevail, a plaintiff "must allege facts indicating that (1) the defendant 'deliberately and maliciously interfered' with that access, and (2) the interference resulted in injury to the Plaintiff."*Doe v. Green,* 593 F.Supp.2d 523, 537–538 (W.D.N.Y.2009) (quoting *Kampfer v. Vonderheide,* 216 F.Supp.2d 4, 7 (N.D.N.Y.2002)); *see also Lewis,* 518 U.S. at 349–350; *Morello v. James,* 810 F .2d 344, 347 (2d Cir.1987); *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001).

Defendants argue that Plaintiff has not stated a § 1983 claim for denial of access to court because Plaintiff has not shown that Defendants deliberately and maliciously failed to file his Article 78 petition. They are correct.

 **\*3** "To find an unconstitutional denial of access to the courts, a plaintiff must demonstrate that the defendant acted deliberately and maliciously."*Dawes v. VanBenschoten,* 21 Fed.Appx. 29, 31 (2d Cir.2001) (citing *Morello,* 810 F.2d at 347). Deliberate and malicious interference is established by a defendant's mental state—specifically, whether he or she had intended to hinder a plaintiff s ability to obtain a remedy in a court of law. *See Cancel,* 2001 WL 303713, at *4; *Smith,* 901 F.Supp. at 649.

Beyond his conclusory assertion that Defendants "intentionally and willfully" denied him access to court, Plaintiff fails to provide evidence of any intentional or willful conduct by the Defendants that was calculated to deprive him of access to court. *See* Ex. A., Compl. ¶ 3. The uncontroverted evidence shows exactly the opposite. Both Defendants tried to help Plaintiff complete the process of filing an Article 78 petition. They advised Plaintiff that his petition could not be filed until certain forms were received and the petition was completed. Asking Plaintiff to complete his filing and provide information cannot be construed as a deliberate and malicious action designed to block access to the courts-even when viewed in the light most favorable to Plaintiff.

Plaintiff asserts that Diaz's January 16, 2004, letter shows that he deceived Plaintiff by stating that he (Diaz) had "just been made aware of Plaintiffs complaint and he is doing everything in his powers to assist the Plaintiff."(Comp.¶ 12., Ex. Q.) Plaintiff does not explain how this statement could have "deceived" him: he offers no evidence that Diaz did not in fact do what he could to assist Plaintiff. In that same letter, Diaz advised Plaintiff that he could not help him file his Article 78 petition until Plaintiff sent both "a copy of the Article. 78 ... [and] the date and the address you [Plaintiff] mailed it to be filed."(Ex. Q.) He also assured Plaintiff that "upon receipt of this information, I [Diaz] will try and obtain the original file and see what if any determination was made."(Ex. Q.) Telling Plaintiff that he needed to file certain documents—so Diaz could try to figure out what happened is not misrepresentation about either Diaz's knowledge of Plaintiff s petition or his willingness to help Plaintiff file the petition. There is no evidence suggesting that Diaz knew about Plaintiffs petition —prior to the date when Rodriguez apprised him of its existence—or that he deliberately hindered Plaintiff from filing the petition. Rather, the letter demonstrates that Diaz attempted to assist Plaintiff in filing his petition. Therefore, Plaintiff's allegation that Diaz deliberately and maliciously intended to interfere with Plaintiffs access to court has no basis in fact.

Plaintiff asserts that James intentionally failed to perform his duties when he requested an additional copy of Plaintiff s Article 78 petition—as well as other documents—in a February 6, 2004, letter, because this request commenced "the merry-go-round all over again." (Compl.¶¶ 15, 20.) Despite Plaintiff's claim, this letter docs not indicate that James maliciously or deliberately attempted to prevent Plaintiff from filing his Article 78 petition. Rather, it reveals James'

intention to abide by the statutory requirements of CPLR § 1101 for filing an Article 78 petition and to assist Plaintiff in doing so. (Ex. R.) James asked Plaintiff to send a Poor Person Affidavit, as required by CPLR § 1101(f), together with a completed index number application and an original, completed copy of a Right to Judicial Intervention (RJI) form, so that he could properly process Plaintiff's petition in accordance with the law. (Ex. R.) James even assured Plaintiff that, once those papers were received, his application would be processed. (Ex. R.) This language cannot be construed as a malicious and deliberate attempt to thwart Plaintiff from filing a petition. On the contrary, it demonstrates James' willingness to assist Plaintiff, as well as his commitment to performing his duties in accordance with the law.

*4 Additional letters from James to Plaintiff dated May 11, 2005 and May 23, 2005 further negate Plaintiff's allegation that Defendant deliberately and maliciously precluded Plaintiff from having access to the courts. In the May 11 letter, James explained that Plaintiff's poor person affidavit had to be signed before the clerk could access copies of his inmate trust fund account for his Article 78 filing fee. (Ex. U.) James' May 23 letter reinforced the necessity of his authorization by quoting from CPLR § 1101(f), which provides that state inmates need to submit documentation of their trust fund accounts before an Article 78 petition could be indexed. (Ex. V.) James also clearly informed Plaintiff that, "we [Supreme Court] will be unable to process your papers without the authorization."*Id.* Again, these letters show that James sought to help Plaintiff comply with the law—not to hinder his access to the courts. They do not contain any evidence showing James' deliberate or malicious attempt to prevent Plaintiff from filing an Article 78 proceeding.

Plaintiff argues that Defendants deliberately and maliciously hindered Plaintiff from filing his Article 78 petition, by insisting that Plaintiff had to provide a signed "authorization" to access his trust fund account, because CPLR § 1101(d) does not use the word "authorization" and "CPLR § 1101(f) sets up a special procedure for *pro se* prisoners, which effectively changes the general rule and allows the commencement of a proceeding by the filing of an unsigned order to show cause."(Plaintiff's Response pp. 31–32; *Grant v. Senkowski,* 95 N.Y.2d 605, 609, 721 N.Y.S.2d 597 (N.Y.2001)). Plaintiff's argument about CPLR § 1101(d) is meritless; the form contains a signature line, and whether the statute did or did not say, Plaintiff had no constitutional right to have the form filed without a signature. And while Plaintiff

correctly notes that CPLR § 1101(f) allows *pro se* prisoners to file an unsigned order to show cause, the signature James requested was not to be placed on an order to show cause form, but on Plaintiff's poor person affidavit. An affidavit is a sworn statement; it must be signed.

Finally, Plaintiff states, in his response to Defendants' motion for summary judgment, that, "while it is unclear what if any specific actions the defendants might have taken, it is certainly clear that Defendants owed the Plaintiff a statutory and constitutional duty to file his motion papers, assign an index number, make the appropriate records indicating the date of filing, and return a date—stamped copy to Plaintiff."(Plaintiff's Reply p. 19.) Plaintiff thus acknowledges that he cannot identify, and so has found no evidence of, any specific actions Defendants "might" have taken with respect to filing Plaintiff's Article 78 petition, let alone evidence that their actions were undertaken "deliberately and intentionally." Defendants were not obligated, by any statutory or constitutional duty, to file Plaintiff's Article 78 petition if Plaintiff failed to submit all the necessary paperwork, including his *in forum pauperis* paperwork.

*5 Plaintiff has thus presented no facts showing that Defendants acted with deliberate or malicious intent in carrying out the actions Plaintiff alleges. Plaintiff's § 1983 claim must be dismissed for this reason alone. There is no need to address any of the numerous other arguments proposed by the Defendants. In particular, there is no need to reach Defendants' contention that they enjoy qualified immunity because they have done nothing wrong. *See Stephenson v. Doe,* 332 F.3d 68 (2d Cir.2003).

### CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted and the complaint is dismissed with prejudice.

This constitutes the decision and order of the Court. The Clerk of the Court is directed to remove the motion at Docket Number 92 from the Court's list of active motions.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3427147

Footnotes

1    Defendants move this Court to dismiss Plaintiff's claims against Charlotte Doe on the grounds that Plaintiff did not use
    due diligence to identify and serve this defendant. There is, however, no reason to inquire into Plaintiff's efforts to identify
    and serve Charlotte Doe because Defendants' motion for summary judgment is granted. For simplicity, the Court only
    will refer to Defendants Diaz and James in its opinion, but its decision applies to Charlotte Doe as well.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.    

2005 WL 1026551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Andre SMITH, Plaintiff,

v.

THE CITY OF NEW YORK, Captain Kennedy
# 425, Corrections Officer Bennett #
12929, Warden Mark Farsi, Defendants.

No. 03 Civ. 7576(NRB).   |   May 3, 2005.

**Attorneys and Law Firms**

Andre Smith, Southport Correctional Facility, Pine City, NY,
Plaintiff pro se.

Michael Chestnov, Assistant Corporation Counsel, New
York, NY, for Defendants.

**MEMORANDUM AND ORDER**

BUCHWALD, J.

 **\*1** Plaintiff Andre Smith, presently incarcerated at
the Southport Correctional Facility in Pine City, New
York, brings this action *prose* under 42 U.S.C. § 1983
against the City of New York, Captain Anthony Kennedy
("Captain Kennedy"), Corrections Officer Dwayne Bennett
("C.O.Bennett"), and Warden Mark Farsi ("Warden Farsi").
Plaintiff claims that defendants destroyed his personal
property and legal papers in retaliation for his filing a federal
lawsuit against another corrections officer, thereby interfering
with his right of access to the courts and depriving him
of his property without due process. Plaintiff brings suit
under 42 U.S.C. § 1983 seeking compensatory and punitive
damages for violations of his First, Fourth, and Fourteenth
Amendments constitutional rights.

Plaintiff filed his initial complaint against defendants on
July 11, 2003, and an amended complaint ("Am.Compl.") on
September 28, 2003. On October 20, 2004, defendants moved
for summary judgment pursuant to Fed.R.Civ.P. 56. For
the reasons discussed below, defendants' motion is granted in part
and denied in part.

**BACKGROUND** [1]

At all times relevant to this complaint, plaintiff was
incarcerated in the Central Punitive Segregation Unit at
the Otis Bantum Correction Center on Rikers Island. On
the morning of July 8, 2003, plaintiff left Rikers Island
for arraignment in a criminal proceeding. *See* Pl.'s Dep. at
86. When he returned to his housing area ("2-South") at
approximately 6:00 p.m., plaintiff's cell and locker were open
and C.O. Bennett informed plaintiff that his property had been
moved from Cell 14 to Cell 15. *Id.* at 91, 93.Plaintiff claims
that prison regulations required him to be present when his
property was moved. When plaintiff asked why his property
was taken, C.O. Bennett replied with something to the effect
of, "I don't like you, I'm pretty sure you know why."*Id.* at
94-95.

After learning that C.O. Bennett had moved his belongings,
plaintiff demanded to speak with Captain Kennedy, C.O.
Bennett's supervisor. When Captain Kennedy arrived, he
allegedly told plaintiff "things happen, this is our house."Am.
Compl. ¶ 19. [2] Eventually, plaintiff requested to see the
property removed from his cell and locker. Pl.'s Dep. at
113-14. When C.O. Bennett retrieved plaintiff's property,
several items were missing. *Id.* at 118.In addition to
approximately nine hundred dollars worth of personal
property, [3] plaintiff was missing a substantial amount of his
legal materials from his cell and locker. Am. Compl. ¶¶ 15-16.

At the time of the incident, plaintiff had one criminal case [4]
and two civil lawsuits pending in this district. Both of
plaintiff's civil lawsuits involved incidents at plaintiff's prison
facility, and both named Rikers Island corrections officers
as defendants. [5] One of plaintiff's cases named a corrections
officer Jordan ("C.O.Jordan"), another corrections officer
assigned to plaintiff's housing unit, as a defendant. Plaintiff's
complaint alleges that C.O. Jordan and C.O. Bennett are
friends from working together in 2-South, and that C.O.
Bennett's actions were in retaliation for plaintiff naming C.O.
Jordan in the lawsuit. All of the corrections officers named by
plaintiff in his two lawsuits were served copies of plaintiff's
complaints by U.S. Marshals on July 8, 2003, the date of the
current incident. [6]

 **\*2** The specific legal materials allegedly destroyed varied
for each case. In his criminal case, plaintiff lost his copies
of numerous motions drafted by his lawyer, along with his

copy of his grand jury minutes. Pl.'s Dep. at 119. Through his lawyer, plaintiff was able to secure replacement copies of the legal documents within approximately three weeks, well before the case went to trial in November of 2003. *Id.* at 120, 204-05.

In the two civil cases, both filed on June 2, 2003, the plaintiff lost copies of his complaints, docket sheets, a *prose* book, a jailhouse lawyer's manual, and different motions that he was "supposed to be looking over and studying because [he] was pro se."*Id.* at 121.In one case, No. 03 Civ. 3989, plaintiff was able to replace the destroyed documents within one week, but plaintiff complains that "instead of [the parties] settling the case at a specific time, [they] had to wait."*Id.* at 123-24.In the other case, No. 03 Civ. 3979, plaintiff allegedly lost copies of various documents sent by defendants' counsel. *Seeid.* at 124.Plaintiff does not elaborate how the loss has impacted that case, and concedes that he is not certain that he even possessed these documents on July 8, 2003, the date of the alleged incident. *Seeid.* at 128.As of the date of this opinion, case No. 03 Civ. 3979 remains pending before Chief Judge Mukasey.

## DISCUSSION

Between his complaint and deposition testimony, plaintiff has alleged three constitutional claims under § 1983:(1) retaliation for the exercise of a constitutionally protected right; (2) denial of access to the courts; and (3) deprivation of property without due process. [7] These claims are discussed in turn below.

### I. Standard for Summary Judgment

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ."*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."*Frito-Lay, Inc. v. LTV*

*Steel Co. (In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993).

In order to defeat such a motion, the nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Id.* at 248 (internal quotation marks omitted). In addition, when deciding a motion for summary judgment, a district court may only consider evidence that would be admissible at trial. *SeeNora Beverages v. Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir.2001).

## II. First Amendment Retaliation

**\*3** Plaintiff alleges that the defendants deprived him of property in retaliation for his filing federal lawsuits against other corrections officers at Rikers Island. Such actions are prohibited under the Constitution because "retaliatory actions may tend to chill individuals' exercise of constitutional rights."*ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993).

Courts approach such retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swiekiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To survive summary judgment, a plaintiff alleging retaliation must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."*Dawes,* 239 F.3d at 492. *SeealsoWinthrow v. Donnelly,* 356 F.Supp.2d 273, 275 (W.D.N.Y.2005) (applying *Dawes* standard to summary judgment motion); *Contes v.. Porr,* 345 F.Supp.2d 372, 377-78 (S.D.N.Y.2004) (same). Since access to the courts is an established constitutional right, *Bounds v. Smith,* 430 U.S. 817, 821 (1977), we turn to the second and third prongs of the retaliation test.

Adverse action is conduct "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."*Dawes,* 239 F.3d at 493. What constitutes adverse action is context specific, and "[p]risoners may be required to tolerate more than public employees,

who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse."*Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999).*De minimis* acts of retaliation do not chill the exercise of constitutional rights, and thus are insufficient to support a First Amendment retaliation claim. *SeeDavidson v. Chestnut,* 193 F .3d 144, 150-51 (2d Cir.1999).

The adverse action alleged by plaintiff involves the destruction of his legal papers and his personal property. This action was specifically directed against plaintiff, was in violation of prison regulations, and deprived him of a substantial amount of personal property. Such retaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action. *SeeSoto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003). In addition, the retaliatory conduct alleged here involves more than just the destruction of personal property. Instead, the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights through the destruction of his legal papers. Accordingly, we find that plaintiff has established an adverse action substantial enough to satisfy the second prong of the retaliation test. *SeeSalahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

 *4 For the third prong, plaintiff must establish a casual connection between the filing of his lawsuits and the retaliatory event. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]."*Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hosps. Corps.,* 940 F.2d 775, 780-81 (2d Cir.1991). With respect to C.O. Bennett, plaintiff has provided direct evidence of the connection between the two events as well as a temporal connection. First, plaintiff alleges that C.O. Bennett's statement "I don't like you, I'm pretty sure you know why" is evidence that plaintiff's property was destroyed because of his lawsuit against C.O. Bennett's co-worker, C.O. Jordan. Taken alone, this statement might not provide sufficient evidence to survive summary judgment, as C.O. Bennett has provided an affidavit that he had no knowledge of plaintiff's lawsuit against Officer Jordan. *See* Defs.' Notice of Motion for Summ. J., Ex. F (Aff. of Dwayne Bennett). However, when this alleged statement is combined with circumstantial evidence regarding the timing of the incident, plaintiff has established genuine issues of material fact regarding the reason for the destruction of his property. *SeeColon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)

("In light of the combination of circumstantial and direct evidence of retaliation that [plaintiff] presents, we conclude that his claim, however valid it may ultimately prove to be, is sufficiently strong to defeat the motion for summary judgment.").

First, plaintiff has established that his property was destroyed on the very same day that the other Rikers Island corrections officers were served with the plaintiff's complaints in his civil suits. Defs.' Ex. C, D. [8] Although plaintiff had filed his lawsuits in early June, it is quite likely that July 8, 2003, is the first date that the individual corrections officers learned they had been named in plaintiff's lawsuits. Second, plaintiff alleges that C .O. Jordan had been working in 2-South immediately prior to C.O. Bennett's shift on the day of the incident, providing C.O. Jordan with an opportunity to discuss with C.O. Bennett plaintiff's lawsuits. Pl.'s Dep. at 95. In light of this highly suspicious timing and C.O. Bennett's alleged statement, a reasonable jury could find a causal connection between the destruction of plaintiff's property and plaintiff's protected action. Accordingly, defendants' motion for summary judgment on the retaliation claim is denied as to C.O. Bennett.

With respect to the other named individual defendants, Captain Kennedy and Warden Farsi, plaintiff must establish their personal involvement in the retaliation in order to sustain a claim under section 1983. *SeeWright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The Second Circuit has described the personal involvement of a supervisory defendant that is required to sustain a claim under section 1983:

> *5 The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff does not claim either defendant actually destroyed his property. Instead, plaintiff cites two statements by Captain Kennedy and Warden Farsi as evidence of their complicity in the retaliatory action, implying either that they directly ordered the retaliation, or at least were aware of it and failed to act as C.O. Bennett committed the constitutional violation. With respect to Captain Kennedy, plaintiff alleges in his complaint that Captain Kennedy told him "things happen, this is our house" after the incident. Am. Compl. ¶ 19. During his deposition, plaintiff further argued that "[Captain Kennedy] is a supervisor, he had-has to know everything that's going on," and reasoned it was "possible" that Captain Kennedy ordered the retaliation. Pl.'s Dep. at 134. As for Warden Farsi, plaintiff states that C.O. Bennett told plaintiff that Warden Farsi had said to C.O. Bennett "this inmate has been bringing too much attention to this jail. Eventually he's going to find out whose house this is." Am. Comp. ¶ 20. At his deposition, plaintiff further stated that "one of his officers is being sued; you would think that this warden would know about it."*Id.* at 163.

Plaintiff's evidence of both defendants personal involvement is minimal, and it is quite possible that plaintiff merely assumes Captain Kennedy's and Warden Farsi's involvement based on their respective positions within the prison. If so, plaintiff's claim against the defendants will ultimately be unsuccessful. *SeeColon,* 58 F.3d at 874. When ruling on a summary judgment motion, however, the Court must view the evidence in the light most favorable to the nonmovant. Given the alleged statements as well as the circumstantial evidence, a reasonable jury could believe that the defendants were personally involved in the violation. Moreover, the defendants have not submitted any evidence that Captain Kennedy and Warden Farsi were not involved in the incident, failing to obtain affidavits from either regarding their alleged involvement. As we have stated before, "[t]he Court is not so sanguine about its ability to identify a plaintiff's false assertions that it will grant summary judgement to defendants who are unwilling to swear that they did not make the incriminating statements alleged."*Allah v. Greiner,* No. 03 Civ. 3789, 2004 WL 1713811, at * 5 (S.D . N.Y. July 29, 2004).

**\*6** Accordingly, the motion for summary judgment on plaintiff's retaliation claim against Captain Kennedy and Warden Farsi is also denied. If the defendants can present the Court with affidavits or other evidence refuting plaintiff's

allegations, the Court will consider another summary judgment motion on these claims.

We caution plaintiff that our denial of defendants' summary judgment motion does not reflect an opinion about the ultimate merits of plaintiff's case. At trial, plaintiff will likely be faced with direct testimony from C.O. Bennett denying any knowledge of plaintiff's lawsuits, and from Captain Kennedy and Warden Farsi denying any personal involvement in the alleged retaliation.[9] A reasonable jury might chose to believe such testimony rather than the primarily circumstantial evidence of retaliation that plaintiff has provided so far. Unlike the present motion, plaintiff's evidence will not be viewed in its most favorable light at trial, and the burden will be on him to prove his case against the defendants. Weighed equally against defendants' evidence, plaintiff's retaliation claim might very well fail.

Whether or not plaintiff will be ultimately be successful in convincing a jury, however, is not for this Court to decide by motion. *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998) ("[S]ummary judgment may not be granted simply because the court believes the plaintiff will be unable to meet his or her burden of persuasion at trial."). Based on the current record viewed in the light most favorable to the plaintiff, a reasonable jury could find that the defendants retaliated against him for the filing of lawsuits against Rikers Island corrections officers. Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is denied.

### III. Denial of Access to the Courts

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts."*Bounds v. Smith,* 430 U.S. 817, 821 (1977). Prisoners must have a "reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."*Id.* at 825.The active interference of prison officials in the preparation or filing of legal documents may constitute denial of access to the courts. *SeeLewis v. Casey,* 518 U.S. 343, 350 (1996). However, a prisoner must show an actual injury in order to sustain a claim for denial of access to the courts. *Id.* at 349.Actual injury occurs only when "the loss of [plaintiff's] materials prejudiced his ability to pursue a legal claim."*Santiago v. N.Y.C. Dep't of Corr.,* No. 97 Civ. 9190, 2003 WL 1563773, at *5 (S.D.N.Y. Mar. 6, 2003); *seealsoDavis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Accordingly, to survive summary judgment, plaintiff must

introduce evidence to establish that his ability to pursue his criminal and civil cases was hindered by the destruction of his legal papers. *See, e.g.,Thomas v. Thomas,* No. 97 Civ. 4541, 2000 WL 307391, at *3 (S.D.N.Y. Mar. 23, 2000).

## A. The Criminal Case

**\*7** A prisoner who is represented by counsel on criminal charges suffers no actual injury to his access to the courts if he is able to present his legal claims through his attorney. *SeePerez v. Metro. Corr. Ctr. Warden,* 5 F.Supp.2d 208, 211-12 (S.D.N.Y.1998); *Santiago,* 2003 WL 1563773, at *5; *Shepherd v. Fraisher,* No. 96 Civ. 3283, 1999 WL 713839, at *5 (S.D.N.Y. Sept. 14, 1999). Despite the loss of plaintiff's personal copies of his criminal papers, plaintiff's was afforded a full opportunity to pursue his criminal defense through his legal representative. Plaintiff's counsel was able to move on plaintiff's behalf and ultimately took plaintiff's case to trial in November of 2003. Pl.'s Dep. at 205. Plaintiff has not alleged that his attorney's ability to present his claims was fundamentally impeded by the loss of plaintiff's copies of the documents, just that it was an "inconvenience" to replace them. Pl.'s Dep. at 120. Accordingly, plaintiff had a reasonably adequate opportunity to present his claim via counsel, and has not established any actual impact on his defense in his criminal case from the destruction of his legal documents. *Perez,* 5 F.Supp.2d at 211.

## B. The Civil Cases

With respect to his civil cases, plaintiff has also failed to establish any actual injury from the destruction of his legal papers. First, both cases were only in their initial stages when plaintiff's legal mail was destroyed. As discussed above, plaintiff's complaints had just been served on defendants on the day of the incident. As such, it is highly unlikely in either case that there were any documents, either from the court or from defendants, that required plaintiff's response or immediate consideration when his legal papers were destroyed. Second, plaintiff was able to replace most of the documents within a relatively short period, and has articulated nothing more than minor delays from the loss of the documents. In case No. 03 Civ. 3989, plaintiff received a favorable settlement, and claims only that the case might have settled earlier if not for the destruction of the documents. Plaintiff's other case alleging assault by a corrections officer, No. 03 Civ. 3979, is still active and awaiting disposition nearly two years after the alleged incident.

The constitutional right of reasonable access to the courts is not violated by "[i]nterferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts."*Jermoson v. Coughlin,* No. 89 Civ. 1866, 1995 WL 144155, at *5 (S.D.N.Y. Mar. 30, 1995). Plaintiff has not established any injury to his legal claims from the destruction of his papers other than the alleged delays. Accordingly, there are no genuine issues of material fact regarding plaintiff's claim of denial of access to the courts, and we grant summary judgment to the defendants on this issue.

## IV. Deprivation of Property Without Due Process

A quintessential aspect of due process is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)). However, when the deprivation is based upon the "random and unauthorized" act of a state employee, an adequate post-deprivation remedy is sufficient to satisfy due process. *Parratt v. Taylor,* 451 U.S. 527, 541 (1981), *overruled on other grounds,Daniels v. Williams,* 474 U.S. 327 (1986); *see alsoHudson v. Palmer,* 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of procedural requirements of Due Process Clause if a meaningful postdeprivation remedy for the loss is available"); *Hellenic American Neighborhood Action Comm. v. The City of New York,* 101 F.3d 877, 880 (2d Cir.1996). In *Parratt,* the Court recognized the impracticability of providing predeprivation hearings for tortious deprivations of property as "the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place."*Id.* Accordingly, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing meaningful, the State satisfies its constitutional obligations by providing the latter."*Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984).

**\*8** However, not all unauthorized deprivations of property can be remedied by postdeprivation hearings. The Second Circuit has distinguished between the random and unauthorized acts of low-level state employees and certain unauthorized deprivations caused by high-level state officials. *Dwyer v. Regan,* 777 F.2d 825, 832-33 (2d Cir.1985). Recognizing that high-level policymakers have "final authority over the decision-making process," a high-ranking official's "ability to anticipate the actions

that he intended [is] ... fairly attributable to the State itself."*Id.* at 833.As such, the acts of high-ranking officials, even if in violation of state procedures, are not "random and unauthorized" withing the meaning of *Parratt* and *Hudson.*Because the State can reasonably be expected to foresee the actions of its high-ranking senior officials, due process will not be satisfied by postdeprivation remedies for their actions. *Id.*

In the instant case, it is difficult to imagine how the State could have anticipated defendants' actions, or what type of predeprivation hearing the State could have provided plaintiff. Moreover, plaintiff has offered no evidence that the actions was anything other than "random and unauthorized" within the meaning of both *Parratt* and *Hudson.*Even assuming *arguendo* that Captain Kennedy and Warden Farsi were somehow involved in the deprivation, they are not the type of high-level policymakers whose actions are fully attributable to the State. *Mejia v. New York City Dep't of Corr.,* No. 96 Civ 2396, 1999 WL 138306, at *2 (E.D.N .Y. Mar. 5, 1999) (assistant warden and captain named in action do not qualify as policymakers). Accordingly, the availability of postdeprivation remedies is a defense to plaintiff's due process claim.

It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing by way of state law causes of action for "negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss ."*Cook v. City of New York,* 607 F.Supp. 702, 704 (S.D.N.Y.1985); *see also* *Dove v. City of New York,* No. 99 Civ. 3020, 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000); *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995)."[P]laintiff's failure to take advantage of the state [law] does not convert his cause of action into a constitutional due process claim."*Smith,* 901 F.Supp. at 647;*see also* *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987) ("[S]ection 1983[can]not be made a vehicle for transforming mere civil tort claims into constitutional injuries.").

Because the deprivation of plaintiff's property was random and unauthorized and plaintiff had access to meaningful postdeprivation remedies, due process was not violated. As such, defendants are entitled to summary judgment on this claim.

**V. Plaintiff's Claims Against the City of New York**

**\*9** In order to hold a municipality liable as a "person" under section 1983, the plaintiff must "first prove the existence of a municipal policy or custom to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection-an 'affirmative link'-between the policy and the deprivation of his constitutional rights."*Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985).

Plaintiff has failed to establish that the alleged constitutional violations were a result of any city policy or practice. Plaintiff's complaint alleges only that the city "hired unqualified people and failed to adequately train them."Am. Compl. ¶ 25. First, plaintiff has offered no evidence to show that the City of New York has a policy of hiring unqualified individuals, nor has he identified any specific deficiencies in its supervision or training of its corrections officers. *See* *Board of the County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 409-10 (1997) (liability may attach if "violation of federal rights may be a highly predictable consequence of a [municipality's] failure [to train officers] ... to handle recurring situations"). Second, such a theory can only be the basis of section 1983 liability if the municipality's deficient conduct was the cause of plaintiff's injury. *See* *Morrissey v. City of New York,* 963 F.Supp. 270, 273-74 (S.D.N.Y.1997). As plaintiff has not established that any "identified deficiency in a city's [training or hiring] program" caused his injury, *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989), we grant the defendants' motion for summary judgment on all of plaintiff's claim against the City of New York.

**CONCLUSION**

For the aforementioned reasons, defendants' motion for summary judgment is denied with respect to the plaintiff's First Amendment retaliation claim against C.O. Bennett, Captain Kennedy, and Warden Farsi, and granted with respect to the other claims against the individual defendants, and granted with respect to all claims against the City of New York.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1026551

Footnotes

1   This factual statement is based on the plaintiff's amended complaint and deposition testimony except where noted.

2   At his deposition, however, plaintiff testified that Captain Kennedy stated that he did not know where plaintiff's belongings were because C.O. Bennett had packed them. Pl.'s Dep. at 132.

3   The missing personal property included personal photographs, hygiene products, clothing, books and magazines. *See id.* at 192-93.

4   It is unclear from the record where the criminal case against plaintiff was filed.

5   Plaintiff's lawsuits concerned an alleged assault by a corrections officer, and an earlier incident of destruction of plaintiff's property by corrections officers. *See Smith v. Benston, et al.,* No. 03 Civ 3979(MBM) (S.D.N.Y. filed June 2, 2003)("No. 03 Civ 3979"); *Smith v. Robertson,* No. 03 Civ. 3989(KMW) (S.D.N.Y. Oct. 16, 2003)(order dismissing the action with prejudice due to settlement) ("No. 03 Civ 3989").

6   While it does not appear that the individual defendants were served directly by U.S. Marshals, other corrections officers at Rikers Island accepted service on their behalf on the morning of July 8, 2003. Defs.' Exs. C, D.

7   To the extent plaintiff makes a claim for violation of his Fourth Amendment rights, plaintiff's claim fails because he does not have a right to be free from searches and seizures of the property in his cell. *See Hudson v. Palmer,* 468 U.S. 517, 525-27, 528 n. 8 (1984) (; *Bell v. Wolfish,* 441 U.S. 520, 537 (1979)("Loss of freedom of choice and privacy are inherent incidents of confinement...."); *Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

8   While a U.S. Marshal did not directly serve C.O. Jordan, the proof of service filed by plaintiff establishes that another corrections officer at Rikers Island, C.O. Houston, accepted service on C.O. Jordan's behalf on the morning of July 8, 2003.

9   Assuming that these defendants are not successful in any renewed motion for summary judgment they might make after submission of the required affidavits.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.